IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Newport News Division)

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>for the use and benefit of DYSEDC, LLC, )<br>700 N. Wickham Road, Suite 203 )<br>Melbourne, Florida 32935 )<br>        )<br>    Plaintiff, )<br>        )<br>v.      ) | Civil Action No. _____ |
| THE CINCINNATI INSURANCE COMPANY, )<br>P.O. Box 145496 )<br>Cincinnati, Ohio 45250 )<br>        )<br>and      )<br>        )<br>ASHFORD LEEBCOR ENTERPRISES, LLC, )<br>1769 Jamestown Road, Suite 112 )<br>Williamsburg, Virginia 23186 )<br>        )<br>    Defendants. )<br>_____) | |

**COMPLAINT**

Plaintiff, the United States of America for the use and benefit of DYSEDC, LLC ("DYSEDC"), hereby sues Defendants, The Cincinnati Insurance Company ("Surety") and Ashford Leebcor Enterprises, LLC ("ALE"), and states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. This is an action for damages pursuant to the Miller Act (40 U.S.C. § 3131, *et seq.*) seeking payment for labor and materials furnished at Patrick Air Force Base located in Melbourne, Florida, and for damages resulting from ALE's breach of its duty of good faith and fair dealing.

2. DYSEDC is a limited liability company organized under the laws of Puerto Rico. As required by the Miller Act, DYSEDC brings this action in the name of the United States of America for the use and benefit of DYSEDC, LLC. *See* 40 U.S.C. § 3133(b)(3)(A).

3. Surety is a corporation organized under the laws of the State of Ohio.

4. ALE is a limited liability company organized under the laws of the Commonwealth of Virginia.

5. This Court has jurisdiction over this action under the Miller Act. *See* 40 U.S.C. §§ 3131, 3133.

6. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims in this action over which the Court does not have original jurisdiction.

7. Venue is proper in this Court as DYSEDC and ALE agreed in Section 24 of the Subcontract between them giving rise to this suit that "[a]ny action instituted for the enforcement of this Agreement shall be resolved only in the federal or state courts of the state of [ALE's] office." The Subcontract between DYSEDC and ALE states in the "INTRODUCTION" section that ALE's office is located in the City of Williamsburg, Virginia. A true and correct copy of the Subcontract is attached hereto as **Exhibit A**.

## FACTUAL BACKGROUND

I. **ALE's Nonpayment of $500,572.00 Owed to DYSEDC**

8. ALE and the US Army Corps of Engineers ("USACE") entered into prime contract number W912QR-18-C-0018, wherein ALE agreed to perform certain work at the Patrick Air Force Base in Melbourne, Florida, for construction of the Guardian Angel Facility ("Project").

9. As required by the federal Miller Act, ALE obtained a payment bond issued by Surety in the penal amount of $22,573,386.00 to secure payment to those furnishing labor and

materials for the work under the prime contract ("Payment Bond"). A true and correct copy of the Payment Bond is attached hereto as **Exhibit B**.

10. ALE and DYSEDC entered into a fixed price Subcontract Agreement wherein DYSEDC agreed to perform a certain portion of work for the Project ("Subcontract").

11. Specifically, DYSEDC agreed to design, fabricate, and erect two metal structures at the Project site: a parachute drying tower and a warehouse building. In return, ALE agreed to pay DYSEDC the total amount of $1,408,300.00.

12. DYSEDC properly performed its entire scope of work under the Subcontract and submitted complete invoices for the same each month according to Section 5 of the Subcontract.

13. In particular, DYSEDC submitted three invoices to ALE in May, June, and September of 2021. Each of these three invoices were complete and otherwise in compliance with the requirements for invoices set forth in Section 5 of the Subcontract:

  a. Invoice #1052, dated May 28, 2021, in the amount of $219,093.00, due on June 27, 2021;

  b. Invoice #1055, dated June 30, 2021, in the amount of $240,660.00, due on July 30, 2021; and

  c. Invoice #1061, dated September 13, 2021, in the amount of $106,458.96, due on October 13, 2021.

14. On or about September 9, 2021, ALE informed DYSEDC that it was withholding $500,572.00 in liquidated damages for 92 days of critical path delay. In truth, ALE withheld payment of all amounts due under invoice numbers 1052, 1055, and 1061 in the amount of $566,211.96.

15. ALE refused to release the difference between the withheld amount of $566,211.96 and the alleged liquidated damages of $500,572.00 until November 10, 2021, and then only after repeated demands from DYSEDC to do so.

16. The total principal amount due to DYSEDC and unpaid by ALE for these three invoices is $500,572.00.

17. DYSEDC furnished the last of its labor and materials to the Project on or about September 13, 2021.

18. DYSEDC demanded payment of the past due amounts from ALE in several letters to ALE, including letters dated August 18, 2021; September 30, 2021; and October 27, 2021.

19. In response to DYSEDC's demands for payment, ALE stated that it is withholding payment because ALE claims that DYSEDC caused 92 days of critical path delay to the Project, which entitles ALE to assess liquidated damages against DYSEDC pursuant to Section 28 of the Subcontract.

20. ALE has refused to substantiate its assertions that DYSEDC caused any delays.

21. DYSEDC did not cause any delays to the Project as will be explained more fully herein below.

22. The Subcontract does permit ALE to withhold payment from DYSEDC for liquidated damages for delay.

23. ALE is wrongfully withholding payment to DYSEDC for labor and materials furnished to the Project for ALE's and USACE's benefit. ALE's wrongful withholding is a breach of the Subcontract.

**II. ALE Deceived DYSEDC Regarding Funds Paid by USACE to ALE for DYSEDC's Change Order Work**

24. As part of its work under the Subcontract, DYSEDC had to submit the design for a parachute drying tower ("PDT") that DYSEDC would ultimately fabricate and erect on site.

4

25. DYSEDC submitted its design, but afterward, in December 2019, USACE changed the requirements for the PDT. USACE's changes necessitated significant changes in DYSEDC's scope of work on the PDT.

26. USACE eventually invited ALE to submit a change order request to account for the time and cost impacts of the government's change to the PDT design. DYSEDC provided a change order proposal of its own to ALE for an additional $532,434.00 to be included in ALE's change order proposal submitted to USACE. ALE submitted its original change order proposal to USACE on January 20, 2020, and submitted an updated proposal on March 23, 2020.

27. ALE's change order request sought (a) $1,895,589.65 in direct costs, extended overhead, and markups; (b) 309 days of compensable time extension; and (c) 130 days of noncompensable time extension due to the changes to the PDT.

28. On November 17, 2020, ALE issued Change Order 4 to DYSEDC, providing for a Subcontract price increase of only $255,701.00 and adding 261 days of noncompensable time to DYSEDC's schedule for changes to the PDT ("CO 4"). DYSEDC's Subcontract amount after CO 4 was only $1,644,390.00.

29. Unbeknownst to DYSEDC at the time ALE issued CO 4, ALE negotiated multiple change orders with USACE to compensate ALE for the added costs and delays caused by the changes to the PDT.

30. The first of these covert change orders between USACE and ALE was Modification P00003 executed on October 13, 2020. Modification P00003 granted ALE a time extension of 414 days and payment of $448,743.00, purportedly to cover all direct costs and related markups included in ALE's change order proposal.

31. The second of these covert change orders was Modification P00004 executed on January 6, 2021. Modification P00004 granted ALE payment of an additional $974,645.00 for ALE's field office overhead costs and markups for 261 compensable delay days.

32. In total, ALE recovered $1,423,388.00 of the $1,895,589.65 it sought in its change order request for the PDT change. ALE's ultimate recovery was 75.5% of the total costs it sought.

33. In comparison, ALE only compensated DYSEDC for $255,701.00 of the $532,434.00 that DYSEDC sought in its change order proposal for the PDT changes. DYSEDC's recovery constituted a mere 48% of the costs it sought for these changes.

34. ALE's cost reports for the Project show that ALE budgeted $1,863,102.53 for the cost of DYSEDC's work after taking into account the changes implemented for CO 4. However, DYSEDC's Subcontract amount was only increased to $1,644,390.00 by CO 4. The difference between ALE's cost budgeting and DYSEDC's is $218,712.53. This difference constitutes $218,712.53 of direct costs in ALE's budget for DYSEDC's work under CO 4 that ALE is retaining rather than paying to DYSEDC.

35. ALE hid from DYSEDC the full extent of its recovery from USACE for the PDT changes and did not pay DYSEDC proportionally to its share of the costs related to the PDT changes. This dishonesty resulted in ALE hoarding a disproportionate share of the contract price adjustment for the PDT changes to the detriment of DYSEDC, which in large part incurred the direct costs of these changes and has yet to be fully compensated due to ALE's deceptive tactics.

36. DYSEDC is entitled to recover at least the $218,712.53 in direct costs that ALE is wrongfully withholding from DYSEDC.

**III.     ALE's Unmeritorious Claims That DYSEDC Delayed the Project**

37.     As mentioned above, ALE claimed that DYSEDC delayed the Project, entitling ALE to charge liquidated damages against Subcontract funds owed to DYSEDC. However, ALE's delay claims are completely unmeritorious.

   A.     <u>ALE's Incorrect Predecessor Work Delayed the Start of DYSEDC's Work</u>

38.     In order for DYSEDC to begin erecting the steel members of the PDT, ALE was required to install anchor rods in certain locations of the Project's concrete walls and pedestals. The anchor rods needed to be properly located so that DYSEDC could attach the steel to the anchor rods and secure the PDT structure to the ground.

39.     During a site visit on or around March 29, 2021, just two weeks before DYSEDC was prepared to start erecting the PDT columns on April 14, 2021, it was discovered that one of the sets of anchor rods was incorrectly located. Location and installation of the anchor rods was not in DYSEDC's scope of work and was solely ALE's responsibility.

40.     ALE issued Change Order 5 ("CO 5") to DYSEDC to implement repairs to the incorrect anchor rod location so that DYSEDC could proceed with installation and erection of the PDT. DYSEDC was not able to begin installation and erection work until May 17, 2021.

41.     ALE claimed that, until April 14, 2021, DYSEDC also delayed the Project due to DYSEDC's alleged failure to timely fabricate and deliver the PDT materials. This alleged delay, even if true, was at most concurrent with the delays caused by ALE's misplaced anchor rods. ALE cannot hold DYSEDC responsible for such delay because it was concurrent with previous delays caused solely by ALE's issue with the anchor rod placement.

42.     DYSEDC was not responsible for any delay prior to April 14, 2021. Any delay during that period was caused by fabrication and delivery delays experienced by DYSEDC's fabrication

subcontractor due to nationwide materials and worker shortages caused by the COVID-19 pandemic and unrelated severe weather that affected the subcontractor's manufacturing facilities.

**B. ALE's Arbitrary Project Schedule Made It Impossible for DYSEDC to Properly Perform Its Work According to the Schedule**

43. ALE also arbitrarily compiled the Project schedule such that it was impossible for DYSEDC to properly perform and complete its work according to ALE's arbitrary schedule.

44. The Subcontract required DYSEDC to "provide adequate input to the creation of the schedule for purposes of sequencing the work . . . ." *See* **Exhibit B**, p. 12. At ALE's request, DYSEDC provided ALE with a correctly sequenced schedule on March 22, 2021; May 3, 2021; and May 17, 2021. At no time did ALE reject DYSEDC's schedule, including durations and sequencing of tasks. Rather than use DYSEDC's informed input to create a functional schedule, ALE completely disregarded the realities of the Project and created an unrealistic and impracticable Project schedule.

45. ALE's Project schedule required DYSEDC to erect the mezzanine platform structure concurrently with erection of the PDT. The Project schedule also required DYSEDC to erect the mezzanine platform grating concurrently with installation of the prefabricated insulated metal roof panels. Performing these tasks concurrently was impracticable and impermissible according to the Subcontract's safety requirements.

46. The mezzanine tasks required use of a crane, as did the erection and roof tasks. DYSEDC's work area was only large enough for one crane, and USACE would not allow a second crane in the area because the cranes' radii of operation would impermissibly overlap. DYSEDC could not possibly perform these tasks concurrently due to the site limitations and USACE's limitations on using multiple cranes.

47. Moreover, concurrent installation of the mezzanine, erection of the steel, and installation of roof panels would require workers on lower levels to work beneath suspended or moving loads, a clear violation of ALE's own Zero Harm principles incorporated into the Subcontract. Working under moving loads would also violate Occupational Safety and Health Administration standards (which DYSEDC was required to observe according to the Subcontract) cautioning against moving loads over people. Again, DYSEDC could not possibly perform these tasks concurrently due to ALE's safety limitations and OSHA regulations.

48. ALE's unrealistic Project schedule made it impossible for DYSEDC to finish its work on time according to the Project schedule. ALE ignored DYSEDC's properly sequenced schedule that accounted for performing the mezzanine tasks sequentially as required by the realities of the project site. DYSEDC is not responsible for the delays alleged by ALE in completing its work under an impossible deadline that ALE created.

49. All conditions precedent to the maintenance of this action have been performed, excused, or waived.

## IV.  ALE's Dilatory Tactics Related to Dispute Resolution

50. The Subcontract requires disputes to be resolved through a series of remedial procedures before DYSEDC is permitted to pursue an action against ALE. The parties must first attempt to resolve the dispute between technical and contractual representatives. If that is unsuccessful, the executive management of each party must meet and attempt to resolve the dispute. After that the parties must mediate. The parties may choose to arbitrate if mediation is unsuccessful, but are not required to do so. If mediation proves fruitless, a party may file suit.

51. After significant efforts by DYSEDC to resolve these disputes between contractual representatives, on or about October 20, 2021, ALE requested an executive meeting, and offered three possible dates. The soonest of those dates was November 23, 2021.

52. DYSEDC insisted that the meeting take place within two weeks. ALE refused to meet sooner than November 23, 2021.

53. In advance of the November 23, 2021 executive meeting, DYSEDC requested that ALE provide any information supporting its contention that DYSEDC is liable for critical path delay, including Project schedules in native format and any schedule analyses performed by ALE. DYSEDC also proposed three mediators. DYSEDC requested that ALE also propose one or more mediators so that the parties could begin mediation promptly if the parties could not resolve the dispute during the executive meeting. ALE refused to provide any of the requested information, and did not propose any mediators.

54. During the November 23, 2021 meeting, ALE executives were unwilling to negotiate in any meaningful sense, and continued to insist that all Project delay was attributable to DYSEDC. ALE executives threatened that mediation would take many months.

55. On November 29, 2021, DYSEDC demanded mediation and again proposed several mediators. ALE did not provide any meaningful response to DYSEDC's mediation demand until December 15, 2021.

56. Upon information and belief, ALE is attempting to delay the dispute resolution process in order to forestall DYSEDC's pursuit of this action.

## COUNT I – MILLER ACT PAYMENT BOND
### (ALE and Surety)

57. Paragraphs 1 through 56 are incorporated by reference as though fully set forth herein.

58. ALE, as principal, and Surety, as surety, are jointly and severally liable under the Payment Bond to pay for labor and materials furnished to the Project.

59. DYSEDC properly furnished all labor and materials to the Project as required by the Subcontract.

60. DYSEDC requested payment from ALE for all of the labor and materials that DYSEDC furnished for the Project, but ALE has refused to pay DYSEDC in full for all of the labor and materials that DYSEDC provided.

61. DYSEDC is a proper claimant under the Payment Bond since it is an unpaid first tier subcontractor. *See* 40 U.S.C. § 3133(b)(1).

62. More than 90 days have elapsed since DYSEDC furnished the last of its labor and materials for which this claim is made.

63. It has been less than one year since DYSEDC furnished the last of its labor and materials for the Project.

64. DYSEDC is entitled to payment of at least $500,572.00 due for labor and materials furnished by DYSEDC for the Project pursuant to the Miller Act.

65. ALE and Surety are obligated under the Payment Bond to pay DYSEDC for the labor and materials furnished by DYSEDC and for which ALE has failed to make payment.

WHEREFORE, the United States of America for the use and benefit of DYSEDC, LLC respectfully demands judgment against The Cincinnati Insurance Company and Ashford Leebcor Enterprises, LLC, jointly and severally, awarding monetary damages in at least the amount of $500,572.00 plus applicable interest, costs, and such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (ALE)

66. Paragraphs 1 through 56 are incorporated by reference as though fully set forth herein.

67. There is a contractual relationship between DYSEDC and ALE as made clear by the Subcontract.

68. Under Virginia law, the Subcontract contains an implied covenant of good faith and fair dealing.

69. ALE breached the covenant of good faith and fair dealing by not informing DYSEDC of the full amount of compensation that ALE obtained from USACE for DYSEDC's work under CO 4, and therefore retaining a significant portion of funds intended for DYSEDC for ALE's own benefit.

70. The Subcontract did not permit ALE any discretion to withhold any portion of the payment from USACE for DYSEDC's work performed under CO 4.

71. ALE's actions were actually dishonest and taken with the intent to deprive DYSEDC of a significant sum of money intended as compensation for DYSEDC's labor and materials actually provided to the Project.

72. ALE's breach of the implied duty of good faith and fair dealing was the proximate cause of damage to DYSEDC.

73. DYSEDC is entitled to payment of at least $218,712.53 for ALE's breach of the implied duty of good faith and fair dealing, bringing the total value of CO 4 to $474,413.53.

WHEREFORE, the United States of America for the use and benefit of DYSEDC, LLC respectfully demands judgment against Ashford Leebcor Enterprises, LLC, awarding monetary damages in at least the amount of $218,712.53 plus applicable interest, costs, and such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

The United States of America for the use and benefit of DYSEDC, LLC, hereby demands trial by jury of all issues so triable.

DATED: December 17, 2021                    Respectfully Submitted,

**UNITED STATES OF AMER1CA**
**for the use and benefit of**
**DYSEDC, LLC**

  /s/ *A. Michelle West*
A. Michelle West, Esq.
Virginia Bar No. 82795
*Attorney for the United States of America*
*for the use and benefit of*
*DYSEDC, LLC*
SMITH, CURRIE & HANCOCK LLP
1950 Old Gallows Road, Suite 750
Tysons, Virginia 22182
Telephone: (703) 506-1990
Facsimile:  (703) 506-1140
amwest@smithcurrie.com